IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
WESTERN DIVISION

| | |
|---|---|
| Aaron Voltz, | Case No. 3:13 CV 150 |
| Plaintiff, | MEMORANDUM OPINION AND ORDER |
| -vs- | JUDGE JACK ZOUHARY |
| Erie County, et al., | |
| Defendants. | |

### INTRODUCTION

Plaintiff Aaron Voltz brings federal and state gender and national origin discrimination claims against Defendants Erie County (the "County"), Erie County Board of Commissioners (the "Board"), and Erie County Department of Job and Family Services ("JFS") following his termination as Director of JFS after being accused and jailed for rape. Currently pending is Defendants' Motion for Summary Judgment (Doc. 48). Plaintiff filed an Opposition (Doc. 51), and Defendants filed a Reply (Doc. 53). Plaintiff also filed a Notice of Supplemental Authority (Doc. 60), to which Defendants responded (Doc. 61). For the following reasons, Defendants' Motion is granted.

### BACKGROUND

**Plaintiff's Work History with JFS**

Plaintiff is a Hispanic male who worked for JFS for fifteen years, beginning in 1996 (Doc. 35, Voltz Dep. at 11–12). Over the course of fifteen years, Plaintiff was continually promoted within JFS. He began his employment as a caseworker in the Children Services Unit (*id.*). Shortly thereafter, he began working as an intake investigator (*id.* at 14–15). In 1997, Plaintiff was promoted to Intake

Investigation Supervisor (*id.* at 16). After that, Plaintiff was again promoted to Assistant Administrator of Children Services (*id.* at 20). With each promotion, Plaintiff received a pay increase (*id.* at 21–22). In 2009, Plaintiff was appointed Interim Assistant Director, and subsequently applied for the permanent Assistant Director position (*id.* at 38–39, 46). Plaintiff was selected for the position over another internal applicant, a Caucasian female (*id.* at 47). As Assistant Director, he worked under JFS Director Judith Englehart.

In December 2010, the County received an anonymous complaint alleging Plaintiff created a hostile work environment at JFS (Doc. 35-1, Ex. 1). County Human Resources Director Margaret Rudolph and, from the County Prosecutor's Office, Paul Schnittker, investigated the complaint (Doc. 35-1, Ex. 2). In January 2011, Rudolph and Schnittker issued a report summarizing their investigation which concluded Plaintiff had a "command presence" which might be perceived as intimidating in an office setting (*id.*). The findings indicated Plaintiff's actions did not rise to the level of creating a hostile work environment, as employees generally felt they could raise complaints to supervising authority (*id.*). The Board decided not to take any action against Plaintiff in light of the report (Doc. 32, Monaghan Dep. at 28).

In January 2011, a newspaper reporter from the *Sandusky Register* began asking Commissioners questions about police reports concerning domestic disputes between Voltz and his then-girlfriend Lori Jesberger (Voltz Dep. at 124–33; Doc. 35-1, Ex. 11). One incident occurred on New Year's Eve 2010; Voltz and Jesberger were drinking and had an argument, which devolved into Jesberger kicking Plaintiff and another man (Voltz Dep. at 126–29). The dispute continued to Jesberger's home, where the pair exchanged words (*id.*). The following week, Plaintiff discovered that Jesberger had filed a police report about the incident (*id.* at 131–32). Plaintiff and Jesberger

2

continued to date off and on until July 2011 (*id.* at 131). The reporter interviewed Plaintiff and ultimately decided not to print an article about Voltz and the police reports (*id.* at 134).

**Plaintiff's Promotion to Director**

In the spring of 2011, Plaintiff applied for the position of JFS Director, as Director Englehart was retiring in June (*see* Doc. 35-1, Ex. 8). Of the twenty applications received, five were submitted by males (Doc. 33-1, Ex. 67). Two of the male applicants were Hispanic (*id.*). The hiring committee for the Director position included County Administrator Mike Bixler, County Commissioner Bill Monaghan, and Rudolph (Monaghan Dep. at 16; *see also* Doc. 33, Rudolph Dep. at 140). The hiring committee interviewed Plaintiff for the position (Rudolph Dep. at 173–74). The interview included a scripted list of questions that the committee asked each candidate (*id.* at 173). In June 2011, Plaintiff had a second interview, which was conducted by the Board with Bixler and Rudolph present (*id.*). The hiring committee made a unanimous recommendation to the Board that Plaintiff be selected for the Director position (*id.* at 174; Doc. 34, Bixler Dep. at 122). The Board approved the recommendation and hired Plaintiff to be the next JFS Director (Rudolph Dep. at 175).

However, before the Board officially hired Plaintiff, Monaghan instructed Bixler and Rudolph to meet with Plaintiff to discuss certain behavior expectations with his promotion to JFS Director (Monaghan Dep. at 31, 33). Monaghan and the other Commissioners were "concerned about any impropriety outside the job that would hit the newspapers and give a negative connotation [to] the county" (Bixler Dep. at 137). To that end, Monaghan instructed Bixler and Rudolph to "sit down with Mr. Voltz and tell him in no uncertain terms that we could not have a replay of anything that had occurred previously and there was no second chance" (Monaghan Dep. at 31). Bixler and Rudolph

3

met with Plaintiff as instructed and were assured by Plaintiff that his conduct outside of work would not be an issue (Bixler Dep. at 137).

In a letter dated June 9, 2011, the County officially notified Plaintiff that he had been selected as JFS Director and that he would be entitled to a four percent salary increase upon completion of a 180-day probationary period (Doc. 34-1, Ex. 36). The letter further informed Plaintiff the position was at-will and unclassified, "serving in an administrative and fiduciary role under the Board" (*id.*).

Plaintiff testified he did not feel any part of the selection process discriminated against him based on his gender or national origin (Voltz Dep. at 105–06). He was selected for the position over a female candidate who was "probably as qualified" as Plaintiff (Monaghan Dep. at 39). Plaintiff's former position of Assistant Director remained vacant following his appointment to the Director position because Plaintiff told the County he could perform both jobs (*id.* at 140).

**The Events Leading to Plaintiff's Termination**

On Friday, July 8, 2011, about a month after Plaintiff was hired as JFS Director, he spent the day with Jesberger at Kelley's Island (Voltz Dep. at 151). The couple consumed alcohol throughout the day (*id.*). Later in the evening, the couple began fighting and, according to Plaintiff, Jesberger "physically assaulted" him such that Kelley's Island police became involved (*id.* at 152). After that incident, Plaintiff left Kelley's Island on a boat to return to Sandusky without Jesberger (*id.*).

During the trip with Jesberger to Kelley's Island, Plaintiff began texting with another woman, Stephanie Codeluppi, who he met years earlier via MySpace and with whom he had an ongoing relationship (*id.* at 159–60, 177). Plaintiff had a volatile relationship with Codeluppi that included Codeluppi filing a rape charge against Plaintiff in 2008 (*id.* at 162). However, Plaintiff continued a relationship with Codeluppi, communicating with her and, on occasion, having sex with her. Plaintiff

4

testified that he continued a sexual relationship with Codeluppi, even after she accused him of rape, because he feared she would become angry with him if he refused her and would falsely accuse him of rape or otherwise slander him, jeopardizing his career (*id.* at 162–72).

After Plaintiff returned from Kelley's Island, he stopped at a bar and waited for Jesberger to return to Sandusky so she could give Plaintiff a ride to his car, which was parked at her home. Jesberger arrived in Sandusky very late in the evening, and the pair got into another argument at Jesberger's home. Plaintiff left, and later drove to Codeluppi's apartment and had sex with her (*id.* at 158–59, 165). Plaintiff spent the night at Codeluppi's apartment, leaving early Saturday morning (*id.* at 172–73). But before he left that morning, Codeluppi noticed Jesberger had been texting Plaintiff's cell phone and Codeluppi "went off on [Plaintiff]" (*id.* at 174). At that point Plaintiff told Codeluppi "I don't want to do this anymore. I'm done with this" (*id.*). Plaintiff left and spent that Saturday with Jesberger (*id.* at 173). At some point, Codeluppi contacted law enforcement and accused Plaintiff of rape (*id.* at 175). On Sunday, July 10, Plaintiff was arrested and remained incarcerated at the local jail for four days (*id.* at 176–78). Jesberger filed for a protection order following Plaintiff's arrest, as did Codeluppi (*id.* at 185). The local newspaper ran a number of articles about Plaintiff's arrest (*id.* at 189).

**The Unraveling**

That Sunday, the County Sheriff contacted County Administrator Bixler and informed him of Plaintiff's arrest. Bixler then notified the three County Commissioners and Rudolph, relaying what the Sheriff had told him about Plaintiff's arrest (Bixler Dep. at 160–61). Rudolph had learned of Plaintiff's arrest from her sister, the prosecutor for the City of Huron (Rudolph Dep. at 11, 13). On Monday, the day after Plaintiff's arrest, the County Commissioners met in a closed session with

5

Bixler, Rudolph, the County Sheriff, and the County Clerk (Rudolph Dep. at 19–20). They discussed Plaintiff's employment with the County in light of the pending rape charge (*id.* at 20). With the recommendation of Bixler and Rudolph, the Board voted to terminate Plaintiff (Bixler Dep. at 157, 162). When this decision was made, no one at the meeting had a police report detailing the allegations by Codeluppi against Plaintiff, or had otherwise investigated the matter (Rudolph Dep. at 20; Bixler Dep. at 165–66, 171). Nor did the Board allow Plaintiff a pre-disciplinary hearing or otherwise give him the opportunity to present his version of events (Bixler Dep. at 89).

Three months later, in October 2011, Codeluppi recanted her allegations that Plaintiff raped her (Monaghan Dep. at 83; Bixler Dep. at 180; *see also* Am. Compl. ¶ 20). The following month, Plaintiff submitted an application for the vacant JFS Director position (Bixler Dep. at 179). Plaintiff was not considered for the position for the same reason he was terminated from the position (Monaghan Dep. at 84). As Monaghan put it, "we felt he didn't live up to the standards that we had asked him to live up to, so we would not rehire him" (*id.*). The Board selected an internal candidate, Karen Balconi Ghezzi, for the position (Rudolph Dep. at 198–99). Ghezzi had been serving as Interim Director since Plaintiff's termination (Bixler Dep. at 175). Ghezzi is a Caucasian female (*see* Doc. 33-1, Ex. 92).

On December 5, 2012, Plaintiff wrote the Board requesting reassignment to his former position of Assistant Director (Doc. 32-1, Ex. 16). In a December 20, 2012 letter, the Board denied the reassignment, explaining that Plaintiff was not "entitled to resume [the position of assistant director] under R.C. 329.02" (Doc. 32-1, Ex. 17). Plaintiff filed this lawsuit, raising claims of gender and national origin discrimination under federal and state law, discrimination under 42 U.S.C. § 1983,

6

and denial of fallback rights under Ohio law. (Plaintiff also raised a claim of retaliation, which he has since abandoned (Doc. 51 at 38).)

### SUMMARY JUDGMENT STANDARD

Pursuant to Federal Civil Rule 56(c), summary judgment is appropriate where there is "no genuine issue as to any material fact" and "the moving party is entitled to judgment as a matter of law." *Id*. When considering a motion for summary judgment, the court must draw all inferences from the record in the light most favorable to the non-moving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). The court is not permitted to weigh the evidence or determine the truth of any matter in dispute; rather, the court determines only whether the case contains sufficient evidence from which a jury could reasonably find for the non-moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248–49 (1986).

### DISCUSSION

**National Origin and Gender Discrimination (Title VII and Ohio Law)**

*Prima Facie Case*

Plaintiff's national origin and gender discrimination claims are analyzed under the familiar *McDonnell Douglas* burden-shifting framework. Under *McDonnell Douglas*, Plaintiff bears the burden of proving the employer discriminated against him. Plaintiff first must demonstrate a prima facie case of discrimination. To prove the prima facie case, Plaintiff must show (1) he is a member of a protected class, (2) he was subjected to an adverse employment decision, (3) he was qualified for the position, and (4) either similarly situated employees outside the protected class were treated more favorably or he was replaced by a person outside the protected class. *Vincent v. Brewer Co.*, 514 F.3d 489, 495–96 (6th Cir. 2007). Ohio discrimination claims under R.C. § 4112.02 are analyzed

under the same framework as Title VII claims. *See Mitchell v. Toledo Hosp.*, 964 F.2d 577, 582 (6th Cir. 1992).

Viewing the facts in a light most favorable to Plaintiff, as this Court must, Plaintiff has put forward evidence satisfying a prima facie case of discrimination. Plaintiff is a member of a protected class with respect to his national origin (Hispanic) and gender (male). Plaintiff suffered adverse employment actions -- his termination and not being selected for rehire. *See Vincent*, 514 F.3d at 495. While Defendants argue the behavior that ultimately led to his arrest and incarceration render Plaintiff unqualified for the JFS Director position, some record evidence indicates he is otherwise qualified for the job, as evidenced by his long career and continued promotion within JFS. Finally, Plaintiff was replaced by a person outside the protected classes, a white female, Ghezzi, satisfying the fourth element. The parties' briefing also makes vague reference to allegations Plaintiff was paid less than comparable employees outside the protected class. To the extent Plaintiff is asserting the adverse employment decision relates to his amount of pay, such a claim is rejected because Plaintiff has not met his burden on that theory.

### *Legitimate, Non-Discriminatory Reason*

A plaintiff who proves a prima facie case of discrimination "is entitled to a presumption that the defendant discriminated against him." *Wright v. Murray Guard, Inc.*, 455 F.3d 702, 706 (6th Cir. 2006). The presumption shifts the burden to the defendant to show a legitimate, non-discriminatory reason for the adverse employment action. *Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 254 (1981). "The defendant need not persuade the court that it was actually motivated by the proffered reasons." *Id.* at 254. Rather, the defendant simply must produce "admissible evidence [demonstrating] the reasons for" the adverse employment action. *Id.* at 254–55.

8

Defendants offer the following legitimate, non-discriminatory reason for termination: Plaintiff "was terminated and not selected for re-hire because [he] was arrested and charged with rape, which cast a negative light upon the JFS" (Doc. 48 at 16). Defendants further explain conduct that leads to allegations of rape and incarceration "jeopardizes the public's trust in the [JFS] [D]irector." (*id.*). The testimony of each of the Commissioners that this is the reason for Plaintiff's termination (and disqualification from being rehired) satisfies the burden of legitimacy.

Because Defendants satisfy their burden to show a legally sufficient reason for the adverse employment action, the burden shifts back to Plaintiff to show the proffered reason is actually pretext. *Cline v. Catholic Diocese of Toledo*, 206 F.3d 651, 658 (6th Cir. 2000). Plaintiff meets this burden if he demonstrates, by a preponderance of the evidence, that the non-discriminatory purpose lacks a basis in fact, did not actually motivate the discharge, or was insufficient to motivate the discharge. *Vincent*, 514 F.3d at 497.

### *Pretext*

Plaintiff asserts five reasons why Defendants' proffered reason is pretext: (1) inconsistencies in the justification for termination, (2) deviation from policy, (3) disparate treatment of similarly-situated employees, (4) post-hoc behavior, and (5) insufficiency of the arrest as a reason to terminate. Each is discussed below.

1.  Inconsistent justifications for adverse employment actions may be evidence of pretext. *Schoonmaker v. Spartan Graphics Leasing, LLC*, 595 F.3d 261, 269 (6th Cir. 2010) (citing *Cicero v. Borg-Warner Auto, Inc.*, 280 F.3d 579, 592 (6th Cir. 2002)). Inconsistent justifications do not rise to the level of demonstrating pretext in instances where, despite some inconsistency, the same underlying justification for the adverse employment action is repeatedly offered. *See id.* at 269–70

(plaintiff could not show pretext where employer repeatedly stated poor performance influenced the decision to terminate); *see also Ercegovich v. Goodyear Tire &Rubber Co.*, 154 F.3d 344, 351 (6th Cir. 1998) (finding no pretext where employer's alleged differing reasons for adverse employment action "revolve[d] around a single idea") (internal quotation marks omitted).

Plaintiff alleges Defendants changed their justifications for terminating him, pointing first to Defendants' initial response to the Ohio Office of Unemployment Compensation ("OUC") (*see* Doc. 33-1, Ex. 68). Rudolph, who authored the response, wrote that the arrest and rape charge caused Plaintiff's termination (*id.*). Rudolph also cited incidents of public intoxication as part of the basis for Plaintiff's termination (*id.*). Plaintiff next points to Defendants' response to his EEOC charge. Comparing Defendants' response to the EEOC charge with their response to the OUC, Plaintiff claims Defendants changed justifications for his termination, shifting from the arrest and rape charge to the conduct underlying the arrest and other "unbecoming" conduct. However, these minor differences revolve around a single idea -- serious inappropriate acts causing distrust in the Director and unwanted negative attention. The justifications are premised on the same underlying facts and reasoning, and any perceived inconsistencies do not demonstrate pretext. *See Ercegovich*, 154 F.3d at 351.

2. Plaintiff alleges the County deviated from its own personnel policies when it terminated him. Violation of organizational policy or procedure may be evidence of pretext. *Zambetti v. Cuyahoga Cmty. College*, 314 F.3d 249, 259–60 (6th Cir. 2002). Plaintiff claims the County's failure to hold a pre-termination hearing deviates from established policy, and cites to portions of Erie County's Personnel Policies (Doc. 33-1, Ex. 57). However, the cited policy does not address discipline of a department head such as Plaintiff and, in fact, contemplates department heads

administering the discipline. (*See id.*) ("when a disciplinary action is taken by the Department Head . . .") ("Supervisors and Department Heads may reprimand employees . . .")). While custom within JFS may have been to hold such a pre-termination hearing, a reasonable juror could not find the failure to hold a pre-termination hearing for Plaintiff, arrested for rape, demonstrates pretext by a preponderance of the evidence. This conclusion is further supported by the Director's status as an at-will employee serving at the pleasure of the Board. Plaintiff's argument also ignores his previous problems with paramours that involved police intervention. This is not a case where Defendant's accusations were out in left field. Plaintiff had exhibited an undisputed history of poor choices and confrontational behavior when it came to his personal relationships.

       3.       Plaintiff next claims pretext through "evidence of the disparate treatment of similarly-situated employees" (Doc. 51 at 30 (citing *Chattman v. Toho Tenax Am., Inc.*, 686 F.3d 339, 350 (6th Cir. 2012)). In *Chattman*, the Sixth Circuit explained that an employee can show pretext by putting forth "evidence that other employees, particularly employees outside the protected class, *were not disciplined even though they engaged in substantially identical conduct* to that which the employer contends motivated its discipline of plaintiff." 686 F.3d at 349 (emphasis added). Here, Plaintiff asserts disparity in pay raises given to two female employees upon promotion versus the smaller pay raise he received upon appointment to the same position is evidence of disparate treatment. But this allegation has no bearing on demonstrating pretext for the subsequent termination decision. Further, Plaintiff offers conclusory statements that other employees who committed acts of "serious wrongdoing" were terminated only after going through disciplinary procedures. This argument fails too because Plaintiff's comparators are not department heads, and were not charged with a serious criminal offense comparable to rape.

11

4. Plaintiff argues Defendants' post hoc behavior of amending the County's personnel policies to include arrests as a basis for termination proves discriminatory intent. In limited circumstances, the Sixth Circuit has found evidence of post hoc behaviors can show pretext. *Thompson v. UHHS Richmond Heights*, 372 F. App'x. 620, 625 (6th Cir. 2010) (citing *Risch v. Royal Oak Police Dep't*, 581 F.3d 383 (6th Cir. 2009)). These behaviors include a showing of a discriminatory environment. *See id.* at 626 (finding pretext where personnel made remarks, after former employee had been terminated, that certain black employees were "troublemakers" and needed to be removed because the supervisor's remarks, considered with other evidence, demonstrated a discriminatory environment). Adding arrests to the potential grounds for termination falls short of evidence demonstrating a discriminatory environment against Hispanic or male individuals.

5. Finally, the unique facts of a department head being arrested and incarcerated for rape in a county office assigned to care for children and families can be sufficient to warrant termination. Plaintiff argues that bad publicity alone cannot be sufficient. However, the severity of the charges are undisputed.

Underlying all these alleged grounds for pretext is the bare fact that the same Board that promoted Plaintiff to Director later fired him. This "same actor" inference provides "[a]n individual who is willing to hire . . . a person of a certain class is unlikely to fire them simply because they are a member of that class." *Burhmaster v. Overnite Transp. Co.*, 61 F.3d 461, 464 (6th Cir. 1995). The Board made the decision to hire Plaintiff after recommendation from the hiring committee a mere month before his termination. After Plaintiff's arrest, the same Board, on the advice of the same individuals who recommended hiring him, elected to terminate him. These acts by the same individuals demonstrate that discriminatory animus did not motivate the termination. It was

12

Plaintiff's own misconduct outside of work (however characterized) that placed him, and his employer, in an unfavorable light in the public eye and resulted in his termination.

Plaintiff, as a last grasp, argues Rudolph held a discriminatory animus and attempted to undermine him, and that her animus can be attributed to the Board under a cat's paw theory. To show cat's paw liability, Plaintiff must show a supervisor acted with discriminatory animus and intent to cause an adverse employment action. *Staub v. Proctor Hosp.*, ___ U.S. ___, 131 S. Ct. 1186, 1194 (2011). If the supervisor's discriminatory actions and intent are the proximate cause of the adverse employment action, the employer will be held liable. *Id.* As Director, Plaintiff was under direct supervision of the Board, not Rudolph. Further, Rudolph was part of the hiring committee that recommended the Board hire Plaintiff. It defies logic for Rudolph to recommend Plaintiff be hired and then, one month later, recommend he be fired because he is male and Hispanic. The cat's paw theory has no application here.

**Fallback Employment Rights Under R.C. § 329.02**

Plaintiff also asserts a claim for "fallback" rights to resume his former position of Assistant Director under R.C. § 329.02. Under that statute, a Director of JFS who is removed is entitled to resume the employment he held immediately prior to his appointment as Director if the prior position was designated "classified." However, employees appointed by the County Board of Commissioners under R.C. § 329.02 are "unclassified." And Plaintiff was so appointed to his former position of Assistant Director (*see* Doc. 46-1, Ex. 14).

In January 2009, the Board adopted a resolution identifying itself "as the appointing authority for the positions listed [including Assistant JFS Director], and designat[ing] the positions as exempt from the classified service of the State of Ohio" (*id.*). While former Director Judy Englehart may

have had some role in his appointment, it would be ignoring County practices of formal appointment by the Board to find Englehart herself made the appointment. Because Plaintiff's former position as Assistant Director was unclassified, he is not entitled to fallback employment rights as a matter of law.

### Section 1983 Claims

In employment discrimination claims, plaintiffs may bring parallel claims under Title VII and Section 1983. *See Risinger v. Ohio Bureau of Workers' Compensation*, 883 F.2d 475, 483–84 (6th Cir. 1989). The Section 1983 claim Plaintiff raises is analyzed under the same framework as discrimination claims under Title VII. *See id.* Based on the above analysis, Plaintiff has no remaining claim under Section 1983.

### CONCLUSION

Plaintiff points to no record evidence that permits an inference that his termination had anything to do with his status as a Hispanic male. Further, as an appointee of the Board, he cannot assert fallback rights under Ohio law. For all the reasons discussed above, Defendants' Motion for Summary Judgment (Doc. 48) is granted in full, and this case is dismissed.

IT IS SO ORDERED.

s/ *Jack Zouhary*  
JACK ZOUHARY  
U. S. DISTRICT JUDGE

June 11, 2014